## ROLAPP v. OGDEN & NORTHWESTERN RAILROAD COMPANY et al.

No. 2116.     Decided June 3, 1910.     On Application for Rehearing, August 1, 1910 (110 Pac. 364).

1. CORPORATIONS—ISSUE OF STOCK—CONSIDERATION. Const., art. 12, sec. 5, provides that corporations shall not issue stock, except to bona fide subscribers therefor, or their assignee, or issue any obligation for payment of money, except for money or property received, or labor done, and that all fictitious increase of stock, or indebtedness, shall be void. Section 11 provides that no corporation shall issue stock or bonds, except for money paid, labor done, or property actually received. Comp. Laws 1907, sec. 316, provides that property may be received in payment for stock, but if so, it must be described in the articles of incorporation, and its fair cash value stated, which statement, except for corporations created for mining and irrigation, must be supplemented by affidavit that the property is reasonably worth the amount in cash stated, for which it is received. Section 432, relating exclusively to railroads, provides that a certificate of incorporation shall not be issued to any railroad company until it appears by affidavit that one thousand dollars for each mile of the proposed railroad has been subscribed, and that ten per cent of the amount subscribed by each subscriber has been paid. Section 331 provides that the property of a corporation and the unpaid capital stock shall be liable for the debts of the corporation. *Held*, that the capital stock of corporations, except those created for mining and irrigation, must represent full actual value, either in money or property, and the subscribers for stock must pay one hundred cents on the dollar, or its equivalent, for their stock, and until so paid they are liable to creditors of the corporation for any balance remaining unpaid on their subscriptions. (Page 554.)

2. CORPORATIONS—ISSUE OF BONDS—"FICTITIOUS INCREASE OF INDEBTEDNESS." Const., art. 12, sec. 11, provides that no corporation shall issue stock or bonds, except for money paid or labor done, or property actually received, and that all fictitious increase of stock or indebtedness shall be void. *Held*, that a corporation cannot issue bonds as a bonus to subscribers to the capital stock, and where subscribers to the stock of a corporation paid for the amount of stock issued to them, so that they were entitled to fully paid stock, bonds of the corporation issued to them in addition to the stock were void, as against creditors while in the hands of stockholders, not purchasers for value and without notice; they being a "fictitious increase of indebtedness" within the Constitution, even though they were issued and delivered as security for additional

money advanced by the subscribers as a loan, either to or for the benefit of the corporation before issuance of the bonds, or though such sum advanced became a part of the consideration for the bonds, such advance amounting to only one-fourth of the amount of bonds issued, and as against the corporaton they could not be enforced for any amount in excess of what the corporation received for them from the stockholders.[1]    (Page 558.)

3. CORPORATIONS—SUBSCRIPTION TO STOCK—APPLICATION. Any arrangement by which the subscriptions of stockholders to the stock in a corporation are diverted from their natural and legal purpose as a fund for benefit of creditors of the corporation is void, as against public policy.    (Page 559.)

4. CREDITORS' SUIT—RIGHT TO REMEDY. Ordinarily, a judgment creditor before he can invoke equity in aid of his judgment must allege and prove that he has exhausted his legal remedies, but such facts need not always be directly proved or alleged, but may be done by inference.    (Page 559.)

### ON APPLICATION FOH REHEARING.

5. CORPORATIONS—"FICTITIOUS INCREASE OF INDEBTEDNESS"—CONSTITUTIONAL PROVISIONS: Under Const. art. 12, sec. 5, providing that all "fictitious increase of stock or indebtedness" of a corporation shall be void, indebtedness incurred for less than full consideration is fictitious, and that some consideration is paid does not relieve the indebtedness from such character.    (Page 562.)

Appeal by Emil S. Rolapp, trustee, against the Ogden & Northwestern Railroad Company and others.

From the judgment the plaintiff appeals.

REVERSED WITH DIRECTIONS.

*Richards, Davis & Boyd* for appellant.

*J. N. Kimball* and *Halverson & Pratt* for respondents.

### APPELLANT'S POINTS.

Did the court err in overruling the demurrer of the plaintiff to the affirmative answer of defendant Smith? Or, in other words, was the court authorized to give defendant Smith the relief given under it, or under the first part of his answer?

---

[1] Crofoot v. Thatcher, 19 Utah, 212, 57 Pac. 171, 75 Am. St. Rep. 725.

The answer upon which he relies alleges conclusions merely and no specific facts and, hence, is insufficient to put the plaintiff upon a defense thereto and all evidence under it was erroneous. That fraud must be specifically pleaded has been repeatedly established by this court. (*Vorhees v. Fisher,* 9 Utah, 303, at p. 306; *Selz v. Tucker,* 10 Utah, 132, at p. 134; *Wilson v. Sullivan,* 17 Utah, 341, at p. 349, 350; *Claflin v. Simon,* 18 Utah, 153, at p. 158-9; *Bank v. Little,* 13 Utah, 265, at p. 274; *Vorhees v. Bonesteel,* 83 U. S. 16, 21 L. Ed. 268 and cases cited.)

Could defendant Smith as a subsequent creditor attack the validity of the trust deed or bonds, either as to lack of consideration or fraud?

That he was a subsequent creditor clearly appears from the pleadings and from his answer. He admits the existence and recording of the trust deed in issue on February 20, 1904 (par. 4, Ab. 51), and alleges his own judgment as of January and April, 1908 (Ab. 54). Then could he attack the conveyance or bonds? The authoritits are to the contrary. They hold that subsequent creditors have no more interest in prior conveyances that the debtor has made than have subsequent purchasers as to prior conveyances. (*Toledo Co. v. Continental Co.,* 36 C. C. A. 155, at p. 187; *Graham v. Railroad Co.,* 102 U. S. 148, 26 L. Ed. 106; approved in *Hollins v. Brierfield Co.,* 150 U. S. 371, 37 L. Ed. 1113, at p. 1116; *Porter v. Steel,* 120 U. S. 673; *Schmidt v. Dahl,* 93 N. W. 665, at p. 668 [Minn.].)

Even if defendant Smith's judgments were prior in time to the trust deed, can he attack it under the answer?

The cases go even further than those we have cited above and hold that, even if the creditor be, in fact, prior he must show certain facts or that he has done certain acts before he can attack the validity of an incumbrance like this. Before he can attack a prior incumbrance or mortgage he must have secured a judgment, with execution and return of *nulla bona* or similar process. In other words he cannot attack it until he has exhausted his legal remedy; and he must show in his pleadings for relief against such prior incumbrance, by prop-

er allegations, upon the ground of fraud or otherwise, that he has exhausted such legal remedy before he can ask for equitable relief. (*Thompson v. Van Vechten,* 27 N. Y. 568, 582; *Chandler v. Colcord,* 32 Pac. 330, at p. 335 [Okla.]; *Sullivan v. Miller,* 13 N. E. 772, at p. 774 [N. Y.]; *Tolbert v. Chandler,* 18 N. W. 647, at p. 648 [Minn.].)

### RESPONDENT'S POINTS.

The averments in Smith's answer are undoubtedly sufficient under the following authorities: (*Bull v. Ford,* 4 P. 1175; *Thelkel v. Scott,* 34 P. 851; *Hager v. Shindlar,* 29 Cal. 60; *In Re Patton,* 42 P. 459.)

In the case at bar, no consideration was given, and the act of the board of directors was *ultra vires* and void, and Smith had a right to show the mortgage was a nullity regardless as to whether he was an existing or subsequent creditor. But it has always been held that that a subsequent creditor could attack a voluntary conveyance where it was executed with intent to deprive future creditors of the means of enforcing the collection of their debts. It was said in *Burdick v. Gill,* 7 Fed. 668: "The well settled rule is that where a conveyance is intentionally made to defraud creditors, it is void as to all subsequent as well as prior creditors," and it is certainly within the rule to say that if the conveyance is made with a view to defrauding subsequent creditors, it is, as to them, void, although all prior creditors are paid in full. Citing: (Story Eq. Juris, 362 *et seq.;* Bump on Fraudulent Conveyances, 311; *Sexton v. Wheaton,* 8 Wheat, 229; Kerr on Fraud and Mistake, 206, 207; I Am. Lead. Cases, Hare & Wallace's notes (5 Ed.), 42 and cases cited in note 2-xx.)

If a person, when about to contract debts, makes a voluntary conveyance, with actual intent to deprive his future creditors of the means of enforcing collections of their debts, and this purpose is accomplished, it is very clear that such subsequent creditors are injured and defrauded. (*Burdick v. Gill,* 7 Fed. 668; *Crawford v. Beard,* 8 P.

537; *Spuck v. Logan,* 99 Am. St. Rep. 427; *Huggins v. Perrine,* 68 Am. Dec. 131; *Brundage v. Cheneworth,* 63 Am. St. Rep. 382; *Hagerman v. Buchanan,* 14 Am. St. Rep. 732; *Winchester v. Charter,* 12 Allen, 606; Bump on Fraudulent Conveyances (2 Ed.), 319; 24 Cent. Dig., Secs. 14-15; Cols. 28-30.)

It is not necessary, under the authorities, that the conveyance should be made with actual intent to hinder, delay or defraud creditors. "Fraud is established in such a case by inference or presumption. It may be inferred or presumed from the nature and character of the transaction itself or from facts or circumstances connected with it. If the necessary result of the act is to place the debtors property beyond the reach of legal process, so as to delay creditors, it will be presumed it was done with fraudulent intent." (*Crawford v. Beard,* 8 P. 541; *Cutcheon v. Buchanan,* 50 N. W. 756 [Mich.] See *Gustin v. Matthews,* 25 Utah 168.)

FRICK, J.

On March 13, 1908, appellant, as trustee, began this action in the district court of Weber County, Utah, to foreclose two mortgages in the form of trust deeds, which, it was alleged, were executed and delivered to the trustee by the Ogden & Northwestern Railroad Company, a corporation, hereinafter styled Railroad Company, to secure the payment of certain bonds issued by said company. The first one of the trust deeds was dated February 20, 1904, and was given to secure eighty bonds of five hundred dollars each, which were dated January 1, 1904, made payable in twenty years from date with five per cent. interest, payable semi-annually on the first days of July and January of each year, interest payments to begin with July 1, 1904. The second trust deed bore date September 15, 1904, and was executed and delivered by said Railroad Company to the trustee to secure forty bonds of five hundred dollars each, dated January 1, 1904, payable in twenty years from date with five per cent. interest, payable semi-annually on the first days of July and January of each

year, interest payments to begin on July 1, 1905. The complaint is in the usual form in foreclosure proceedings and conforms to the statute of this state, and each set of bonds, and the trust deeds securing the same, are set forth in separate causes of action in the complaint.

The property that was included within the trust deeds is in each of said deeds described as follows: "All of the real estate and buildings of the Ogden & Northwestern Railroad Company, all tracks, rails laid, sidings, turnouts, bridges, depots and stations, cars, motors, engines, and other stock and equipment, snowplows, tools, implements, easements and privileges, materials on hand, furniture, and fixtures, all franchises and rights of way, and all personal property used in connection with the said line of railway, now owned or hereafter acquired, used on the present mileage by this company, and to be used in connection with said line of railroad, being located in the counties of Weber and Box Elder, state of Utah."

The only parties who were made defendants to the action when it was commenced were the railroad company aforesaid and one A. R. C. Smith, who, it was alleged, claimed "some interest or lien upon the aforesaid mortgaged property." Mr. Smith died after he had filed his answer, and the executors of his last will and testament were substituted as defendants. We shall treat the case as if Mr. Smith were defending in person.

Mr. Smith, in his answer, after various admissions and denials, affirmatively averred that he, on January 30 and April 22, 1908, obtained judgments against said company in the district court of Weber County, Utah, amounting in the aggregate to $3781.25, which were wholly unpaid; that said judgments (one for costs and the other for damages) were obtained in one action instituted against said company by said Smith to recover damages for the destruction of his property by fire negligently set by the Railroad Company. We remark that the property was destroyed, and said action was commenced several years after the bonds and trust deeds

37 Utah—35

in question were executed and delivered. Mr. Smith also averred that the trust deeds set forth in the complaint were made and delivered "without any consideration moving to his codefendant from the plaintiff or any other person." He further averred as follows: "He further alleges upon information and belief that said mortgages were recorded by his said co-defendant with the purpose and intent to hinder, delay, and defraud any and all creditors that it might thereafter have, and he further, upon his information and belief, alleges: That said mortgages were delivered to the plaintiff as aforesaid, and accepted by him, with the purpose and intent of hindering, delaying, and defrauding this defendant, and preventing him from enforcing the collection of his said judgments." Mr. Smith also denied that the trust deeds were ever delivered to the trustee. There was a special demurrer interposed to the answer, but this demurrer did not in any way refer to or assail any of the matters affirmatively pleaded, and hence is of no importance now.

At the hearing the court found the issues against the appellant on the first cause of action and held the first issue of bonds and trust deed void as against the judgments of Mr. Smith on various grounds, but valid as against the company. The second issue of bonds and trust deed the court held valid, and also held them to be a prior superior lien on the mortgaged property, as against Mr. Smith's judgments. The court entered a decree of foreclosure, ordered the mortgaged property sold and the proceeds applied as follows: (1) To pay the amount found to be due on the second trust deed; (2) to pay the amount found due on the judgments of Mr. Smith, and (3) the remainder to be paid to appellant as trustee under the first deed. The trustee alone appeals.

Some of the findings of fact are vigorously assailed. It is also contended that the allegations of the answer were insufficient in some particulars to authorize the relief granted by the court. The pleadings and findings are very voluminous, covering over eighty pages of the printed abstract. It is impracticable to set any of them forth even in condensed form, and we shall not attempt to do so. Moreover, the view

we take of the whole case makes it unnecessary for us to make an extended statement of the evidence adduced at the hearing.

We shall therfore confine ourselves to a statement of what we deem to be the material and controlling facts, as we have determined them from a careful reading of the evidence contained in the original bill of exceptions, from which it is made to appear that in June, 1901, one William A. Paxton, of Omaha, Neb., as the owner, by proper deed conveyed to David Eccles, of Ogden, Utah, certain lands specifically described in said deed, and on which lands were situated what was commonly known as the Ogden Hot Springs, all of which, together with the improvements surrounding them, as well as the line of railroad between Ogden City and said springs, and all property of every kind and description, including all franchises and rights of all kinds connected with said springs and railroad, were conveyed by said deed to said Eccles for the sum of $20,000, which sum was then and there paid by said Eccles to said Paxton for all of said property, rights, and franchises. At or about the time said property was purchased and paid for by said Eccles, he and a number of certain individuals, whom we shall refer to hereafter, entered into an agreement among themselves whereby it was agreed that the railroad property aforesaid should be segregated from the springs property and should be incorporated, and that each one of said individuals then agreed to and did contribute a certain amount to a fund which was to be used to repay Mr. Eccles for the amount he had paid to Mr. Paxton for all of the property. Mr. Eccles himself agreed to and did contribute to this fund. It was also understood that each person who had contributed to the fund aforesaid should receive stock in the railroad corporation which was to be formed, in the amount that he had contributed to said fund. In other words, the railroad property was to be conveyed by Mr. Eccles to the corporation when organized as payment in full for two hundred shares of one hundred dollars each of its capital stock, and each one of the persons aforesaid was to receive one share of said stock for each one hundred dol-

lars that he had contributed to the fund aforesaid. It was also agreed that when said corporation should be organized it should issue bonds to the amount of $40,000 and each one who had contributed to said fund, in addition to his stock, should receive two dollars in bonds for every dollar that he had paid into the fund as aforesaid. The payments to said fund were made during the summer of 1901, and Mr. Eccles was repaid the amount he had paid Mr. Paxton, less the amount he himself had agreed to contribute to the fund aforesaid. Considerable time elapsed before the contemplated corporation was finally organized. When it was organized its authorized capital stock was limited to $200,000, which was divided into 2000 shares of $100 each. Of this amount $20,000, or ten per cent. thereof, was paid up by the persons above mentioned in the manner aforesaid and for which each one received one share of stock for every one hundred dollars he had contributed as stated. On January 1, 1904, the corporation issued bonds to the amount of $40,000. These bonds were issued in denominations of $500 each, and provided for interest and were payable as hereinbefore stated, and were given as a bonus to the persons aforesaid in the proportion of two bonds for every five shares of capital stock which were held by each of them.

There is some controversy between counsel with respect to what constituted the actual consideration for the bonds delivered as aforesaid. In our judgment this matter is put beyond dispute by Mr. Kircher, the secretary of the corporation, who, although an adverse witness in the case, testified upon this point as appears in the original bill of exceptions, as follows: "Q. Now, as a matter of fact, you paid for your stock by having Mr. Eccles transfer the railroad property to the company, didn't you? A. I suppose practically so, yes; it is just simply a question of not issuing the stock at the time when we put up our money. We were not incorporated at that time. Q. And on your ledger and cashbook you have the sales of these bonds dating away back to 1902? A. The bonds were not issued at that time; they show on their face they were not issued until January, 1904; they were paid for,

but they were not issued or delivered until January, 1904. Q. But you carried them on your cashbook as having been sold in 1902? A. Sure. I couldn't carry them any other way. It was understood we were going to bond the road for that amount. . . . Q. It was a fictitious account up to 1904? A. Not as long as it was thoroughly understood we were going to bond; it was just simply a delay in getting the bonds printed and getting them up."

This same witness also testified that when the corporation was organized and the ten per cent. of stock issued, he received five shares and $1000 of bonds of the first issue for the $500 he had contributed to the fund which was applied to repay Mr. Eccles for what he had advanced in purchasing the railroad property and the springs aforesaid. Two other witnesses who were contributors to the fund aforesaid also testified in the case. Mr. James Pingree, who acted as agent for the purchaser in obtaining the property from Mr. Paxton, and who contributed $2000 to the special fund and received $2000 of the capital stock of the railroad company, when asked with respect to the $40,000 issue of bonds, in response to the following questions, testified as follows: "Q. That first issue of bonds. What became of them, if you know? A. I received bonds for the amount I paid in; I suppose the others did the same. Q. You received bonds, yourself, for the amount you subscribed? A. Yes, sir. Q. And you subscribed $2000? A. Yes, sir. Q. And before that time you had paid Mr. Eccles the $2000? A. The $2000 was paid and afterwards given to Mr. Eccles. I did not pay it directly to him."

Mr. Volker, another one of the original subscribers for railroad stock, and who contributed to the special fund to pay for the property, when asked with respect to how he obtained his proportion of the $40,000 bond issue, in answer to the following questions, said: "Q. Mr. Volker, at the time you paid your subscription, did you receive any bonds of the railroad company? A. Yes, sir. Q. Now, how much in amount? A. If I recollect, two bonds. Q. Two

bonds of $500 each? A. Yes, sir. Q. That was double the amount of your subscription, wasn't it? A. Yes, sir."

Mr. Kircher, Mr. Pingree, and Mr. Volker were the only ones of the subscribers who testified, and, as appears from the testimony, they all received precisely two dollars in bonds for every dollar of stock subscribed for by them. It is true that each one of the subscribers afterwards was assessed ten per cent. of the amount of his subscription, which was paid, and that they subsequently also paid additional sums, so that their payments amounted to an additional $10,000, which will hereafter be more specially referred to.

From the testimony we have quoted above it is clear, we think, that the bonds were primarily issued and delivered to the subscribers to secure the amount of their subscriptions. That the recipients of the bonds may also have intended that the bonds should evidence the additional payments may perhaps be true, but this was merely incidental and had nothing to do with the original plan of issue, as appears from the testimony we have quoted. The second issue of $20,000, it appears, was purchased by the subscribers at fifty per cent. of their face value, but with this issue we are not concerned now.

The names of the subscribers for railroad stock, and the amount each subscribed, are as follows:

| | |
|---|---:|
| David Eccles | $ 9,000.00 |
| Thomas D. Dee | 2,000.00 |
| H. H. Spencer | 2,000.00 |
| E. M. Allison, Jr. | 500.00 |
| W. J. Shealy | 500.00 |
| R. S. Joyce | 500.00 |
| James Pingree | 2,000.00 |
| N. C. Flygare | 500.00 |
| J. W. F. Volker | 500.00 |
| C. W. Nibley | 1,000.00 |
| William Eccles | 1,000.00 |
| C. H. Kircher | 500.00 |
| Total | $20,000.00 |

In the articles incorporating the railroad company the exact number of shares that were paid for as indicated above were issued, but the distribution thereof was not quite in the same order or proportion, as appears from article 7, in which the shares are distributed as follows:

| | | |
|---|---|---|
| David Eccles | $ 4,000 00 | 40 shares |
| Thomas D. Dee | 5,000 00 | 50 shares |
| H. H. Spencer | 5,000 00 | 50 shares |
| E. M. Allison, Jr. | 500 00 | 5 shares |
| W. J. Shealy | 500 00 | 5 shares |
| R. S. Joyce | 500 00 | 5 shares |
| James Pingree | 2,000 00 | 20 shares |
| N. C. Flygare | 500 00 | 5 shares |
| J. W. F. Volker | 500 00 | 5 shares |
| William Eccles | 1,000 00 | 10 shares |
| C. H. Kircher | 500 00 | 5 shares |
| Total | $20,000 00 | 200 shares |

It will be noticed that David Eccles reduced his amount from $9000 to $4000, Thomas D. Dee and H. H. Spencer increased theirs from $2000 to $5000 each, and C. W. Nibley, with $1000, dropped out altogether. These changes and transfers were evidently made between the time the money was originally paid and the time when the stock was issued and the bonds distributed. It is also made to appear that the subscribers for the stock aforesaid received the whole of the $40,000 bonds issued January 1, 1904, in the proportion we have already stated.

It is strenuously insisted that the consideration for the first issue of bonds was by the subscribers paid in money as follows: That after the original agreement was entered into and the $20,000 subscription had been paid pursuant thereto, the subscribers, by way of an assesment, paid the further sum of $10,000 as a loan to or for the benefit of the Railroad Company, all of which was paid before the bonds were issued and delivered. From this it is claimed that the bonds were in fact issued and delivered as evidence of the said indebted-

ness and to secure the same. There is some evidence in the record that the subscribers paid the $10,000 as stated, but that the bonds were originally delivered as security therefor may well be doubted. Indeed, when the transactions are viewed in the light of the documentary evidence, there is little room for doubt that the bonds were agreed to be and were in fact delivered to the subscribers as a bonus. In this connection it should not be overlooked that each subscriber received just double the amount of bonds that he subscribed for stock, and this too, regardless of the amount he subsequently paid on the $10,000 assessment. This fact squares precisely with the manner in which the bonds were distributed, as already stated. From the testimony we have set forth, and from the manner the distribution on the first issue of bonds was made, we are convinced that the claim that the $40,000 bonds were issued and delivered to secure the $10,000 paid in on the assessment is a mere afterthought. True, in one sense, it may perhaps be conceded that the bonds might be taken as evidencing the $10,000, but in our judgment, when the idea of issuing bonds was originally conceived, and when the original agreement was entered into, the bonds were not intended to secure anything except the money advanced by the subscribers in payment for the property purchased from Mr. Paxton. It might as well be claimed that the second issue of bonds for $20,000 was intended to secure the $10,000 assessment. It is also to be remembered that it was about the time the Railroad Company was organized and the railroad property and franchises were conveyed to it another corporation was organized by the same individuals who had subscribed for the railroad stock. The latter corporation had a capital stock of $20,000, all of which was paid up by conveying to it the Ogden Hot Springs property which had been purchased from Mr. Paxton with the railroad property, which latter had already been conveyed to the Railroad Company as aforesaid. We thus have $20,000 worth of stock paid for in the Railroad Company and a like amount in the Ogden Hot Springs Company with property which was purchased for $20,000. In

other words, stock of the face value of $40,000 was paid for
with property purchased for $20,000, unless we allow the
$10,000, which was paid as an assessment by the subscribers
to railroad stock, to figure in the deal. We think a fair in-
ference from all the evidence, oral and documentary, is to the
effect that the $20,000 paid for the property purchased from
Mr. Paxton, together with the $10,000 paid as a so-called
assessment, in fact constituted payment for $40,000 of paid-
up stock which was issued to the subscribers of both corpora-
tions, and that the $40,000 bonds were intended and were
in fact issued and delivered as a bonus to the subscribers as
aforesaid. The claim that those interested in the Railroad
Company after the bonds were issued made further payments
of money to or for the use of said company is entirely foreign
to the legal questions involved and may therefore be elimi-
nated from further consideration.

The principal question to be solved therefore is whether
the $40,000 bonds which were issued and delivered to the
original subscribers of the stock of the Railroad Company,
as hereinbefore stated, can be enforced as against corporate
creditors. Section 5 of article 12 of the Constitution of this
state, so far as material here, reads as follows:

"Corporations shall not issue stock, except to bona fide subscribers
thereof or their assignee, nor shall any corporation issue any bond, or
other obligation for the payment of money, except for money or property
received, or labor done. . . . All fictitious increase of stock or in-
debtedness shall be void."

It will be noted that the Constitution is silent with regard
to how stock may be paid for. Section 316, Comp. Laws
Utah, 1907, which forms a part of the general law on the
subject of corporations, provides that property may be re-
ceived in payment for stock, but if this is done the property
so received must be described in the articles of incorporation
and its fair cash value must be stated, which statement, ex-
cept for corporations created for mining and irrigation must
be supplemented by the affidavit of three persons acquainted
with the property, who must state that the property is

reasonably worth "the amount in cash" stated in the articles of incorporation, and for which it is received by the corporation. In section 432, which exclusively relates to railroad corporations, it is in substance, provided that a certificate of incorporation shall not be issued to any railroad company until it shall be made to appear by the affidavit of at least three of the incorporators that $1000 for each mile of the proposed railroad has been subscribed, and that ten per cent. of the amount subscribed by each subscriber has been paid. Again, in section 331, which is the section fixing the liability of stockholders, it is provided that "the property of the corporation and the unpaid capital stock shall be liable for the debts of the corporation." The holder of "full-paid" stock is, however, discharged from all liability for corporate debts. Section 11 of article 12 of the Constitution of California relating to the matter now under consideration, reads as follows: "No corporation shall issue stock or bonds, except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void." We shall refer to this provision again later.

If we keep in mind all of our own constitutional and statutory provisions, we think it is manifest that it was the intention both of the people who adopted the Constitution and the Legislature who passed the foregoing sections that the capitol stock of corporations excepting those created for mining and irrigation, shall represent full actual value, either in money or property, and further that the subscribers for stock shall pay one hundred cents on the dollar, or its equivalent, for the stock subscribed for by them, and until so paid that they are liable to creditors of the corporation in a proper proceeding for any balance remaining unpaid on their subscriptions. No doubt when stock is once "full-paid," whether in money, property, or labor, it may be bought and sold at any price, but commercial or business corporations in this state may not issue stock to their subscribers for less than the face value thereof, which must be paid for, either in money or property. If, therefore, stock

is issued to subscribers for less, it is not "full-paid" stock within the purview of the statute, and a subscriber would be liable for any unpaid balance as aforesaid.

Under the Constitution corporate bonds, or other obligations for the payment of money, may not be issued, except for money, or its equivalent in property or labor. To issue bonds as a bonus to subscribers to the capital stock of corporations of this state is therefore forbidden by the organic law. In view of the foregoing what is the status of the $40,000 bonds which were issued and delivered to the original subscribers for the capital stock of the Railroad Company? When the corporate subscribers thus paid in the first $20,000 they simply paid for the amount of stock issued to them and were thus entitled to "full-paid" stock for that amount, but were not entitled to anything else. The bonds that were given to them thus were a mere gratuity, unless it can truthfully be said that the bonds were issued and delivered as security for the additional $10,000 which the subsscribers had advanced as a loan either to or for the benefit of the railroad company before the first issue of bonds was actually delivered to them. While it is but natural that such a contention should now be put forth, yet from the testimony which we have quoted, and which comes from the subscribers themselves, and for the reasons we have already advanced, such a contention seems entirely untenable. But if for argument's sake we should assume that the first issue of bonds was delivered as security for the $10,000, then the bonds would still be in conflict with the organic law of this state. To deliver $40,000 of bonds for $10,000 makes the bonds fictitious to the extent of seventy-five cents on every dollar. Such bonds in the hands of the original stockholders could not be sustained, because directly contrary to the letter of the Constitution. Nor, from a legal point of view at least, does it help the matter any if it be said that the $40,000 bonds were in fact delivered to secure both the $20,000 paid for the two hundred shares of stock and the additional $10,000 paid afterwards. So far as the payment for stock is concerned, that was a payment by the subscribers to the

corporation for stock and in no sense a loan from them to it and the law would not permit such a payment to be·converted into a loan nor repaid by the corporation to the subscribers, either directly or indirectly. (*Sawyer v. Hoag,* 17 Wall. [U. S.] 610, 21 L. Ed. 731.) The principle discussed and applied in the foregoing case is approved in *Crowfoot v. Thatcher,* 19 Utah 212, 57 Pac. 171, 75 Am. St. Rep. 725. The $20,000 therefore cannot legally form any part of the consideration for the $40,000 issue of bonds.

As we have already stated, we think the inference is palpable that the first issue of bonds, amounting to $40,000, was issued and delivered as a bonus to the subscribers. By this method, the subscribers for the $20,000 were thus not only given a promise in writing that their subscriptions would ultimately be repaid to them, but, in addition to this, an attempt was made to secure them an annual income of ten per cent, on the $20,000 actually paid in, in the form of five per cent. interest on $40,000 of bonds issued to them. Any arrangement by which the subscriptions of the stockholders are diverted from their natural and legal purpose as a fund for the benefit of the creditors of the corporation is against public policy and void. This principle is well and clearly stated by Mr. Justice Lurton in the case of *Morrow v. Iron, etc., Co.,* 87 Tenn. 262, 10 S. W. 495, 3 L. R. A. 37, 10 Am. St. Rep. 658, by the following statement:

"The scheme proposed, upon which this corporation was to be organized, fixed the capital stock at $350,000. The public has a right to presume that this stock has been, in good faith, subscribed, and that it will be paid. They have also the right to presume that the fund thus subscribed and paid in will, in good faith, be held and preserved as a capital and basis of credit and confidence. This much is held out to the public by the representation that its capital stock is $350,000. But running along with this proposition that there shall be a capital stock of $350,000 is the additional stipulation that the property of the company, which is to be procured by means of this capital stock, is to be mortgaged to secure bonds in amount precisely equal to the whole capital stock, and these bonds, instead of being sold for their market value and the proceeds applied to corporate uses, are to be divided out among the stockholders. Says complainant in his bill: 'Every subscriber was to have bonds and also stock of the company each to the amount of the subscription.' The result of this scheme, if it had been carried out

would have been that each subscriber would have received the obligation
of the company to repay to him, with interest, his contribution to the
capital stock of th company, and this obligation would have been se-
cured by a first mortgage upon all the company's property.  It was an
agreement whereby the franchise was to be secured, and at the same
time deprive the public of the security which by law they are entitled to
have, and upon which the grant of the franchise depends.  Whatever
the real motive and purpose of the promoters of this arrangement may
have been, its legal effect, if valid, would have been to have thrown all
the risks and hazards of the business upon the public who should deal
with it, while the contributors were to reap all possible gains, and
should be secured against loss in the event the enterprise proved un-
profitable.  Is a contract by which a corporation agrees to repay to
the contributors of its capital stock their several contributions, and
whereby such contributions are converted into corporate debts, valid
even as against the corporation?  Upon what consideration does such
an agreement rest and what power has a corporation to bind itself by
such a contract?

Counsel for appellant seek to distinguish the case at bar
from the one just quoted from upon the ground that in that
case the bonds were delivered as a bonus, or as a mere gra-
tuity to the subscribers, while in this case it is contended
that the $40,000 bonds actually secured advances of money
made by the subscribers to the corporation in the amount
of at least $10,000.  But, as we have seen, this was neither
the actual agreement nor intention of the parties in interest,
and when the distribution of the bonds was made it was not
made upon any such basis.  But if, for the sake of argument,
we again concede that the $10,000 paid by the subscribers
after the first agreement to incorporate and before the bonds
were actually distributed, became a part consideration for
the bonds, yet the whole transactions is tainted with at least
two vices, one of which was the attempt to secure and repay
to the subscribers their original subscriptions, and the other
to issue corporate bonds to stockholders for much less than
the face value of the bonds, which is forbidden by the Consti-
tution.  Being thus tainted we think that as against creditors
of the corporation such bonds, while in the hands of stock-
holders who are not purchasers for value and without notice,
are of no force or effect, and that as against the corporation
they cannot be enforced for any amount in excess of what the

corporation received for them from the stockholders. We think that any amount in excess of what was actually received by the corporation from the stockholders either in money or its equivalent for bonds, so long as they have not passed into the hands of innocent holders **2** for value and without notice, is, in the language of the Constitution, "a fictitious issue of indebtedness," and is therefore void.

As we have pointed out, the Constitution of California contains a similar provision. The only difference is that the language with respect to the receipt of money or its equivalent in the California Constitution applies to corporate stock as well as to corporate bonds, while in ours it is made to apply to bonds and other obligations for the payment of money. The provisions with regard to what constitutes full payment for stock has been frequently under consideration by the Supreme Court of California, as appears from a review of the cases found in the case of *Vermont, etc., Co. v. Declez, etc., Co.,* 135 Cal. 579, 67 Pac. 1057. The Supreme Court of that state, after considerable waivering in the case last cited arrived at the conclusion that the constitutional provision means that a corporation cannot legally dispose of its stock for less than par paid in money or its equivalent in property or labor. If this be the correct construction of the provision, and we think it is, then it necessarily follows that what we have said with regard to what a corporation of this state is authorized to receive for its bonds, at least as between it and its stockholders, must be the par or face value thereof paid in money or its equivalent in either property or labor.

The Constitution of Alabama contains a provision similar to ours, and the Supreme Court of that state has repeatedly held that corporate bonds cannot legally be issued to stockholders, at least, for less than the face or par value thereof, to be paid either in money or its equivalent. (*American, etc., Co. v. Crane,* 142 Ala. 620, 39 South. 233; *Roman v. Dimmick,* 115 Ala. 233, 22 South. 109.) See, also, *Farmers' Loan & Trust Co. v. San Diego St. Car. Co.* (C. C.),

45 Fed. 528, where the doctrine is clearly stated that under constitution and statutory provisions like ours neither corporate stock nor bonds can legally be issued, except for the face or par value paid for in money or its equivalent.

We have cited the foregoing cases for the sole purpose of illustrating the principle that corporate bonds may not, as against corporate creditors, be legally issued and delivered to subscribers under the circumstances disclosed by the record in this case. The question of selling or negotiating corporate bonds to strangers, or what the rights of innocent purchasers may be, is not involved in this case, and hence we express no opinion with respect thereto.

It is, however, strenuously contended by the appellant that the allegations of Mr. Smith's answer were insufficient to entitle him to assail the bonds in question. In this connection it is, in effect, contended that unless Mr. Smith was injured or affected in his rights to collect his judgments he could not attack the bonds as a mere creditor of the corporation, and that he has not alleged or proved that he is so affected or injured. It is undoubtedly the law that, as a general rule, a judgment creditor, before he can invoke the aid of a court of equity in aid of his judgment, must allege and prove that he has exhausted his legal remedies. But the facts need not always be directly proved or alleged. This may be, and often is, done by inference. This principle is well illustrated by Chancellor Williamson in the case of *Dunham v. Cox*, 10 N. J. Eq. 437, 64 Am. Dec. 460, and in the case cited in the note to the case of *Massey v. Gorton*, 90 Am. Dec. 289. If all the allegations contained in both the complaint and the answer filed in this case are considered together, and in connection therewith the inferences that may be deducted from such allegations, we are of the opinion that the facts stated were sufficient to authorize a court of equity to act in this case, and that they were also sufficient to authorize Mr. Smith to attack the validity of the bonds and trust deeds. The first issue of bonds which were delivered to the original subscribers as

a bonus were clearly void in their hands as being against public policy, for the reasons hereinbefore stated, and as pointed out by Mr. Justice Lurton in *Morrow v. Iron, etc., Co., supra.* In legal effect those bonds were of no greater effect as against Mr. Smith's judgments than if they had been issued for the express purpose of defrauding Mr. Smith, or to delay him in the collection of his judgments. Mr. Smith had a judgment lien on at least the real property of the company. That he had, or claimed, such a lien was alleged in the complaint and admitted in the answer, where it was also more particularly stated what the nature of the lien was and when it was obtained. From the complaint it also appeared that the corporation owned no property of any kind or character, nor could own any, on which the first trust deed which was given to secure the first issue of bonds was not claimed to be, and, *prima facie* at least, was a lien paramount to Mr. Smith's judgments. It would have been a needless thing therefore to have issued an execution and levied it upon the railroad property, because to have done so would have ended only in litigation. We venture the assertion that no one would have been willing to bid for or purchase the railroad property when offered for sale under an execution issued on Mr. Smith's judgment, because to do so would simply have meant the purchase of a law suit, of which this appeal offers ample proof. While we have no desire to, nor do we, depart from the salutary rule that either a judgment or other creditor may not ordinarily in a court of equity assail the validity of prior liens until such creditors have exhausted their legal remedies, yet, in view of the facts and circumstances which appear in this case, we think the court committed no error in permitting Mr. Smith to attack the trust deeds in this action.

With regard to the finding that the first issue of bonds and the trust deed securing the same have not been delivered to the trustee, we are of the opinion that the court erred. We think the evidence is not only sufficient, but is practically uncontradicted that the first issue of bonds and trust deed were both delivered to the trustee, but in the view

we have taken of the case the finding becomes really immaterial. This is also true with respect to all the other findings complained of, and hence it is not necessary that we specially pass upon those assignments. The same may be said with regard to all the other assignments of error.

The only question that remains, in view of the facts and the law applicable thereto, is, What relief are the parties to this action entitled to? We are of the opinion that the first issue of bonds and the trust deed given to secure it, as against the judgments in question, are void, and of no force or effect; that in no event can the stockholders be permitted to recover judgment on those bonds for more than the amount advanced to the Railroad Company after they had paid $20,000 on their subscriptions, in case the court shall find that said sum, namely, $10,000 with interest, was intended to be secured by the first bond issue; that the second issue of bonds is valid to the extent that the subscribers have advanced money on them, to-wit, to the extent of fifty per cent. of their face or par value, with interest as specified therein; that in view that no complaint is made of the ruling of the district court in holding that the lien created by the second trust deed constitutes a prior and paramount lien on the railroad property and franchises against the judgment in question, such ruling, so far as this appeal is concerned, must prevail; that the facts stated in the pleadings are sufficient to authorize the respondent to assail the validity of the bonds and trust deeds in a court of equity, and that such a court has jurisdiction in the premises.

In view, therefore, that the judgment appealed from is for too large an amount as against all corporate creditors and such stockholders as are not bond-holders and as against the corporation itself for the reasons hereinbefore stated, the judgment must be and it accordingly is reversed, with directions to the district court to set its findings of fact and conclusions of law aside so far as they conflict with the views herein expressed, or in so far as they are made immaterial by reason thereof; and said court is further directed to sub-

37 Utah—36

stitute proper findings of fact and conclusions of law in conformity with the views herein expresed; further, to enter a decree of foreclosure and order the sale of the property in question, and to make distribution of the proceeds derived from said sale as herein directed, neither party to recover costs on this appeal.

STRAUP, C. J., and McCARTY, J., concur.

### ON APPLICATION FOR REHEARING.

Counsel for appellant have filed a petition for rehearing. The principal grounds alleged in the application, are: (1) That we erred in the interpretation given the constitutional provision set forth in the opinion respecting corporate indebtedness; and (2) in reversing the judgment for the second issue of bonds.

As to the first ground, counsel vigorously contend that the last sentence of the section quoted by us from the Constitution, namely, "All fictitious increase of stock or indebtedness shall be void," does not mean that bonds issued and delivered by a corporation to a stockholder for fifty cents on the dollar are for that reason fictitious to any extent. It is strenuously argued that if the indebtedness of the corporation is based upon any consideration whatever passing to the corporation, such indebtedness is not fictitious, and that the framers of the Constitution did not intend otherwise in adopting section 5 of article 12 of the Constitution which we have copied into the original opinion.

We cannot agree with this contention. If such a construction should be given to that section it might as well have been left out of the Constitution, because such a construction would rob the section of all force and effect. Before the Constitution of this state was thought of a total want of consideration vitiated any corporate bond or other evidence of indebtedness, at least as between the parties and all those who could not claim to be innocent purchasers for value and without notice. If, therefore, we

should hold as counsel contend, the constitutional provision would in legal effect amount to no more than a declaration of the law in force before the Constitution was adopted by the people of this state. We cannot adopt this view.

We are forced to the conclusion that in adopting the constitutional provision with respect to corporate indebtedness both the framers of that instrument and the people who ratified it meant just what they said, namely, that all fictitious indebtedness should be void. By this they meant that corporations may not indirectly secure corporate subscribers by issuing bonds and delivering them to such subscribers as a bonus, or to dispose of them to the stockholders for a mere fraction of their face value. Those who are related to the corporation no doubt, if acting in good faith, may advance money or property, or perform services for such corporation and may in cnsideration therefor receive its bonds or other evidence of indebtedness from it; but if they do so they must be limited in their claims to the amount or value of the consideration which they gave for the bonds or the other evidences of indebtedness. Whatever the corporation promised to pay in excess of this constitutes a fictitious indebtedness. If this is not so, why were corporations as artificial persons singled out in the Constitution? Why not have left the subject of fictitious bonds or other evidences of indebtedness to be dealt with as the common law stood upon that subject, and which law applied to all indebtedness whether incurred by a natural or an artificial person? Since the Constitution refers only to artificial persons, namely, corporations, upon the subject of fictitious indebtedness, we must assume that it was intended to change the law upon that subject so far as such artificial persons are concerned, or the law would have been left as it was and would then have remained applicable to all persons alike, whether natural or artificial. We are well satisfied with the conclusion reached in the opinion upon this point.

It is, however, suggested by counsel that since we intimate that the rule laid down in the opinion as applicable to stockholders may not be applied to other holders of corporate

bonds or evidence of indebtedness, this distinction will be both unfair and diffcult of application. A sufficient answer to this suggestion at this time is that we dealt only and could deal only with bond-holding stockholders in the original opinion. We excluded innocent purchasers of bonds for value and without notice from the opinion for obvious reasons. As to what shall constitute innocent purchasers of corporate bonds who purchase for value and without notice, and what the rights of such purchasers are under the constitutional provision referred to, can be best determined when that question is presented for decision. That good reasons may exist for making a distinction between stockholders as corporate creditors and others who in in no way are related to the corporation is obvious. We have not attempted to, nor are we laying down any rule upon that subject. We leave it just where we think the Constitution of this state has placed it. In passing we remark, however, that we cannot see wherein either right or justice will greatly suffer if a corporate creditor (who is not an innocent purchaser of corporate bonds) is required to receive from the corporation in payment for his claim the exact amount, with interest, that he advanced to the corporation. Nor can we see how business interests will be adversely affected if a particular subscriber to corporate stock is prevented from securing his subscription by a lien on the corporate property, to the prejudice of general creditors and other innocent stockholders. The doctrine announced in the opinion practically goes no farther than this.

With regard to the second ground urged by counsel, we are of the opinion that counsel have misconceived the effect of the conclusion reached by us with respect to the priority of lien for the second installment of bonds. While it is true that we said that the second installment of bonds was valid only for fifty cents on the dollar, we nevertheless did not modify, nor attempt to modify, the judgment for the full amount of said installment, because that part of the judgment was not complained of by any one. In saying therefore that those bonds were invalid to the extent of fifty

cents on the dollar we meant that this was the legal effect of the constitutional provision in question, but in view that no complaint was made of the judgment which was for the full amount of the value of the bonds, the judgment would not be disturbed upon that branch. The statement in the original opinion may not have been as clear upon that point as it could have been made, but with what we have now said there can be no further misapprehension.

We cannot agree with counsel, however, that we erred in reversing the judgment for the reason that it was excessive. No other conclusion than the one reached in the original opinion is permissible. The judgment in favor of appellant, in so far as the amount thereof is concerned, reads as follows: "That the plaintiff to have and recover of the defendant, the Ogden & Northwestern Railroad Company, the sum of seventy-five thousand, two hundred and fifty-three dollars ($75,253)." This judgment is entered as an entirety and covers every bond that was issued and delivered by the railroad for any purpose, or to any one. The other matters contained in the judgment almost entirely refer to the liens and to the priority of such liens. The judgment, therefore, with respect to the amount for which it was rendered, came before us as a whole and we had to review it as such. The only reason we did not review that portion of the judgment which established a first lien in favor of appellant for the full amount of the second issue of bonds was because that part of the judgment was expressly excluded from the notice of appeal and no one who was interested or had a right to complain complained of it in this court. This, however, does not apply to that part of the judgment we have herein set forth in full. As to that various exceptions were taken and urged upon us for consideration. We held the first issue of bonds as void *in toto* as against respondent Smith, and void as against the Railroad Company in so far as it is not supported by a consideration other than what the holders thereof paid upon their stock subscription. There being no finding upon that particular question, and no proper finding being possible upon that point under the evi-

dence as it now stands, we reversed the judgment for $75,253 as excessive and remanded the cause to the district court, so that that court may ascertain the amount, if any, that the judgment should be upon the first bond issue, enter judgment therefor, and then order the judgment, executed by ordering a sale of the property, and divide the proceeds of sale in the order herein suggested.

In view that the result reached in the former opinion is right, the judgment there entered with the foregoing explanations is adhered to.

No reasons appearing why a rehearing should be granted, the application is denied.

STRAUP, C. J., and McCARTY, J., concur.