# EAST RIVER BOTTOM WATER CO. v. BOYCE et al.

No. 6455.   Decided July 23, 1942.   (128 P. 2d 277.)

See 67 C. J., Waters, sec. 1003; 13 Am. Jur., 472.

*Christenson & Christenson,* of Provo, for appellant.

*J. C. Halbersleben* and *A. L. Booth,* both of Provo, and *Elias Hansen,* of Salt Lake City, for respondents.

MOFFAT, Chief Justice.

The East River Bottom Water Company, plaintiff and appellant, and the State Bank of Provo, are corporations organized and existing under the laws of the state of Utah. The East River Bottom Water Company issued to one Cordner certificate No. 7, representing seven shares of stock in the East River Bottom Water Company. Cordner endorsed said certificate to one Stewart. Stewart endorsed said certificate to one Peter Boyce. Without the surrender of said certificate No. 7, the secretary of said water company issued to Peter Boyce certificate No. 56, representing seven shares of stock in the water company in lieu of certificate No. 7. Later said certificate No. 7 was presented and surrendered to the secretary of the water company and certificate No. 68 was issued in its place. This constituted a duplicate issue of seven shares. Later certificate No. 96 was issued upon presentation and surrender of certificates No. 56 and 68. Certificate No. 96 purported to represent fourteen shares of stock of the water company. The State Bank of Provo made a loan to George L. Boyce, who pledged certificate No. 96 as security. The bank accepted the certificate as representing fourteen shares of stock as it purported to do on its face. The water company prays that seven shares held by the bank be declared void and surrendered for cancellation.

The articles of agreement of the water company set forth the object, powers and purposes of the water company and they are very limited. The object, as shown by articles IV and XIV, is "the controlling, managing and distribution" of certain waters of Provo river awarded to the incorporators

as residents of River Bottom by decree of the District Court. The water company was formed because

"there has been difficulty and annoyance experienced by the parties hereto in exercising their right to the use of water by reason of there being no suitable and enforceable regulations."

No actual cash subscription for the capital stock other than amount necessary "to pay the actual expenses" of the corporation was required. The signing of the articles of agreement and the payment of the amount required

"shall constitute a transfer of all its rights and privileges of the parties to the control, management and distribution of the water of the corporation, and will entitle the said parties to receive stock certificates for the amount of their interest in the corporation."

The corporation was a loose sort of a mutual agreement for the unified management and distribution of the water to the owners. The limited and restrictive words for the purpose of "control, management and distribution" is not a conveyance separating a water right appurtenant to land from the land and does not vest the title or right of use in the corporation within the provisions of Revised Statutes of Utah 1933, Section 100-1-10 and Section 100-1-11. The company has power or authority only to manage, control and distribute the water. The water right was never severed from the land and is still appurtenant thereto. An examination of the articles of agreement to determine what a stock certificate represented would, either for investment or loan purposes, disclose what the certificate actually represented. There is no power of assessment in the original article. The annual expenses were to be submitted to the stockholders and when the proportion of each one was determined he was not to be permitted to use water until his pro rata share of the expenses were paid.

The only legal basis upon which stock could be issued in the company was by signing the articles of incorporation and agreeing to the method of distribution and control and

presumptively upon a showing that such person was the owner of a water right in the Provo river as shown by the decree referred to in the articles of incorporation.

The stock certificates constitute a declaration of the proportion of the water to be distributed to the persons to whom they were originally issued upon which regulations for distribution were based.

There is no provision for treasury stock, and while there are two classes of water rights referred to, there is no provision for classes of stock to correspond to the classes of water rights.

The duplicate issue of seven shares was and is void.

Judgment is reversed and the cause remanded to the trial court to take such proceedings as will be in harmony herewith.

Appellant to recover costs.

LARSON, J., and LESTER A. WADE, District Judge, concur.

WOLFE, Justice (dissenting).

I dissent.

Plaintiff contends the court erred in finding (1) that there was not an over-issue of stock in the plaintiff corporation by this duplicate issue, (2) that consideration was given for these duplicate issues by the surrender of certificate number 7, and (3) in finding that the duplicate issue of stock was valid and represented a proportionate share of water in the plaintiff corporation.

It is plaintiff's first contention that these seven shares in controversy are absolutely void because plaintiff had no treasury stock from which these shares could lawfully be issued and, hence, the shares are an over-issue of the plaintiff's stock and are void. Plaintiff has the burden of proof on this point.

Plaintiff first offered the Articles of Incorporation to show the limitations placed on the amount of stock plaintiff could lawfully issue. There is a variance in these articles. Article 5 states:

"The amount of the capital stock of this corporation shall be 3450 dollars, divided into 345½ shares of $10.00 each."

Article 19 shows that at the inception of the corporation 268½ shares of primary and 142 shares of secondary stock were subscribed making a total of 410½ shares. Either we must hold that there was an oversubscription at the outset or else the limitation in article five must be construed to pertain only to the shares of primary stock. If this interpretation be accepted, and it is the only interpretation which would explain the variance, then this exhibit shows there was only a total of 268½ shares of primary stock issued. This would leave 77 shares of unissued primary stock. The secretary of the plaintiff corporation testified that he did not know how many shares were issued. The president stated that 345½ shares of stock were allowed to be issued by the articles of incorporation but he did not know whether or not that amount had ever been issued. When asked: "You don't know that more has been issued?", he answered, "Well, I don't think it has."

This is all the evidence that was offered on the issue of an oversubscription of stock.

This evidence, to say the most for the plaintiff, would leave us in doubt on the question of whether there had been an overissue of primary stock. The plaintiff has not fulfilled its duty to persuade us as to this fact. The lower court found against it. Reviewing the evidence independently of the trial court, we cannot say it came to a wrong conclusion. Its finding that there was no overissue of primary stock is certainly as consistent with the evidence as a finding that there was an overissue.

Plaintiff's contention that the court erred in finding that consideration was given for the duplicate issues by the surrender of certificate 7 is well founded. The uncontradicted

evidence shows that the corporation issued certificate 56 when the misrepresentation that number 7 was lost was made to the corporation. Nothing was surrendered at this time. The corporation issued certificate 56 to replace a certificate which was reported to have been lost. The later surrender of certificate 7 in return for a certificate number 68 was not intended to act as consideration for the issuance of certificate 56. The fact is uncontradicted that 14 shares of stock have been transferred for the surrender of 7 shares of the same stock. Such an exchange is expressly prohibited by Article 12, Section 5 of our Constitution.

But the court found that the bank was a bona fide purchaser of this stock and had paid all assessments that were levied against it. Even though the court held that there was no consideration for the stock, the issuance was only voidable and not void. Hence, the conclusion of the court was correct although it must rest on an estoppel. We proceed to develop this point.

It is plaintiff's contention that the provision of the Constitution, Article 12, Section 5, makes the stock in controversy absolutely void. Both defendants have defended on the theory that this provision makes the stock only voidable; that as they are purchasers in good faith for value, the corporation is estopped from asserting that the issue of the second seven shares was without consideration.

The provision of the Constitution so far as it is material here provides:

"Corporations shall not issue stock, except to bona fide subscribers thereof or their assignee, nor shall any corporation issue any bond, or other obligation, for the payment of money, except for money or property received, or labor done. * * * All fictitious increase of stock or indebtedness shall be void."

Plaintiff contends that this provision makes any issuance of stock without consideration void because the issuance of stock without consideration is a fictitious issue.

The definition of "fictitious" as given by Webster's International Dictionary is "feigned, imaginary, pretended,

not real, fabulous, counterfeit, not genuine." If there was treasury stock any issue thereof, even without consideration, was not an issue of stock which did not exist. It was not false or feigned or imaginary or counterfeit stock. It was true stock issued without consideration. It is our opinion that the word "fictitious" as used in Article 12, Section 5 of the Constitution pertained only to stock which in fact did not exist. Only such stock was void. As to indebtedness or bonds issued without consideration the case may be different since the very transaction which ostensibly brings them into existence would not be supported by consideration, whilst treasury stock has been created prior to its issue and already legitimately exists. See *Rolapp* v. *Ogden & Northwestern Railroad Co.*, 37 Utah 540, 110 P. 364.

If stock or bonds are void, it is doubtful whether estoppel can be invoked regardless of whose hands into which they came. However, it may be that estoppel could, in certain cases, be invoked even to prevent the assertion that a document was "fictitious" and therefore "void." If so, as to innocent purchasers for value, the result would be the same as if the securities were held to be merely voidable. But if estoppel may not be invoked as to a stock or bond issue which is void the implication of the Rolapp case is incorrect. On the other hand, if the implication is correct, unless estoppel may be invoked to prevent the assertion of voidness, it can only be supported on the grounds that "void" as used in Article 12, Section 5, means only "voidable" unless, of course, as before suggested bonds issued without consideration are themselves "void" as compared to stock properly existing in the treasury.

We think, as above stated, that as to stock the Constitution meant only an overissue to be fictitious and therefore void. An issue out of the treasury without consideration is not "fictitious" and therefore not "void" but only voidable. And this seems to be the holding of the Supreme Court of Texas. In construing a constitutional provision identical with ours, it clearly held that the issuance of stock without

consideration was not a factitious issue, when it said in the case of *Smith* v. *Ideal Laundry Co.*, Tex. Civ. App., 286 S. W. 285, 287:

"The distinction made by the founders of the Constitution between the unlawful issuance of stocks or bonds for an inadequate or no consideration, and the fictitious increase of stock or indebtedness, is just and right, for the first may involve lack of business acumen, but the second involves fraud and moral turpitude. The former may involve such negligence and lack of business sense as to render the act voidable; the latter is criminal, and renders the transaction void."

The court then held the plaintiff estopped to deny the validity of stock issued for insufficient consideration when these stocks had reached the hands of innocent purchasers.

In the case of *Fich* v. *Warrior Cement Corp.*, 16 Del. Ch. 44, 141 A. 54, the Delaware court in construing a provision similar to ours held that stocks issued without consideration were not void but merely voidable, and a person who with full knowledge participates in the issuance of stock for insufficient consideration will be estopped to deny the validity of the said stock. *Farmers Loan & Trust Co.* v. *San Diego St. Car Co.*, C. C., 45 F. 518, 528, is to the same effect. In the case of *Rolapp* v. *Ogden & Northwestern Railroad Co.*, supra, it was suggested, as heretofore stated, that a bona fide purchaser without notice might recover. This seems inconsistent with the idea of the nonexistence of stock or indebtedness, i. e., voidness.

There are several jurisdictions which accept the plaintiff's interpretation of this Constitutional provision. *Lee et al.* v. *Cameron et al.*, 67 Okl. 80, 169 P. 17; *First Avenue Land Company* v. *Parker*, 111 Wis. 1, 86 N. W. 604, 87 Am. St. Rep. 841. But we believe the better rule to be that this provision would make the issuance of stocks and bonds without consideration or with inadequate consideration only voidable. To hold otherwise would enable the corporation and its stockholders to issue stocks contrary to the terms of the Constitution, and then when innocent third parties were injured, the Constitution would be used to shield them.

The fact that this court excepted mining and irrigation corporations in the Rolapp case does not mean that the Constitutional provision has a different effect on them. There we adopted the rule that if property is exchanged for stock in a mining or irrigation corporation, that property must be fairly estimated to equal the stated value of the stocks issued. If the property so exchanged is not fairly estimated to equal the stated value of the stock, then the stockholders would be liable in a proper proceeding to the creditors of the insolvent corporation. *Tintic Indian Chief M. & Milling Co.* v. *Clyde,* 79 Utah 337, 10 P. 2d 932.

For other cases holding that a corporation which issues stock in violation of statutory or constitutional provisions respecting receipt of consideration as against bona fide purchasers for value or pledgees for value, see: *McCandless* v. *Furlaud,* 296 U. S. 140, 56 S. Ct. 41, 80 L. Ed. 121, rehearing denied in 296 U. S. 664, 56 S. Ct. 304, 80 L. Ed. 473; *Bankers' Trust Co.* v. *Rood,* 211 Iowa 289, 233 N. W. 794, 73 A. L. R. 1421; *Westminster Nat. Bank* v. *New England Electrical Works,* 73 N. H. 465, 62 A. 971, 3 L. R. A., N. S., 551, 111 Am. St. Rep. 637; and American Jurisprudence, Corporations, sec. 218. For a compilation of cases on both sides of this issue, see the annotation 73 A. L. R. 1435.

There is no occasion for determining whether the lower court's finding on negligence is correct. It is immaterial. In passing it may be said that the issuance of a new certificate for old certificate No. 7 after certificate No. 56 had been already issued in place of certificate No. 7, smacks of negligence. This is not a suit against the corporation for negligently issuing fictitious or void stock.

The plantiff is not in a position to complain of the judgment of the trial court on the grounds that its judgment giving the plaintiff an election either to issue to the bank its proportionate share of water or pay to the bank $700 in exchange for the stock. Once it is declared to be valid on the basis of estoppel, then the refusal of the plaintiff to issue water to the bank cannot be upheld. Hence, the trial court's

granting of damages of $5 per share per annum is a correct judgment, as is the judgment directing the plaintiff to issue water to the bank on this stock in the future. The plaintiff can then not be heard to complain because the court gives to the plaintiff an alternative whereby it can take up the stock by paying to the bank $700.

It is stated in the concurring opinion in *Stanley* v. *Stanley,* 97 Utah 520, 94 P. 2d 465, 469, that in the review of equity cases

"we would go over the record to determine what our conclusions of fact were from the transcript of the evidence, and if at the end of that investigation we were in doubt or even if there might be a slight preponderance in our minds against the trial court's conclusions, we would affirm. This is because we would be confined to the dry written record and would not have the benefit of seeing and hearing the witnesses."

Here there was testimony from which the court could fairly and reasonably find that the reasonable rental value of the stock was $5 per share per annum and also find the fair value of the stock to be $100 per share and we affirm these findings.

In regards to the defendant Boyce, the plaintiff complains that the court erred in finding as a fact that it was Peter Boyce who perpetrated the fraud on the corporation, and in its further finding that George Boyce was a purchaser for value without notice. The stock certificates which were received by the fraud or mistake were offered in evidence. They show that the stock was issued to Peter Boyce. George Boyce testified that he did not get the duplicate issues from the corporation, although another witness testified it was George Boyce who got the certificates. Here again when we apply the rule set out in *Stanley* v. *Stanley,* supra, the findings of the trial court should be affirmed. When it is decided that George Boyce was a bona fide purchaser without notice, it is not material which one of various third parties did defraud the plaintiff.

In conclusion I revert for a moment to the opinion of Mr. Chief Justice MOFFAT.

The opinion holds that where the corporation papers signed by all the water users could not be construed as a conveyance of their rights and there were no separate conveyances of their rights together with their interest in the canal system, the users still retained legal title to the water and it remained as appurtenant to the land, the corporation having no title. The corporation, in such case, runs the argument, would only have managerial powers. It would be, in a sense, a corporate water master. The stock certificate would not evidence any right except that of a certificate showing that the managerial corporation was required to perform the task of distributing a certain amount of water to each holder of a certificate—in a sense, a water ticket. Under this theory a transfer of a stock certificate would convey no right to the water to the transferee. Consequently, neither George Boyce nor the bank received any right to water because the title to the water was still in the original water users who had incorporated. It is difficult to see what George Boyce and other transferees did receive by a transfer of the stock certificate. The incorporators still owned the water. A transfer of the stock certificate evidencing only a right to exact distribution of one's own water under a water right which had never been conveyed to the corporation could hardly be asserted by the transferee of the certificate unless in addition he received a conveyance of the water right from the land owner who still held title to that water right. Only then would the water be severed from the land. Yet, I would suppose that stock in this corporation has been conveyed with the thought that it carried not only a right to exact from the corporation manual delivery of the water, but that it evidenced a participation in a corporation which owned the water and that it therefore served the purpose of conveying what was equivalent to the stockholder's water right. I can sympathize with the view that the old settlers when they formed a mutual water company for

purposes of cooperation and mutual distribution and administration of water covered by their rights did not contemplate that the company was other than a mechanism to do for them what they might have done through an unincorporated association. I so expressed myself in my concurring opinion in the case of *Fower et al.* v. *Provo Bench Canal & Irrigation Co.*, 99 Utah 267, at page 278, 101 P. 2d 375, 377. I would think this to be the case, however, whether they actually conveyed their water rights to the corporation or not. It appears to me that the purposes for which the corporation was formed and not the matter of conveyance of water rights to the corporation would control.

In the Fower case, supra, it appears that the object of the corporation was

"to convey water from Provo River to Provo Bench and lands adjacent thereto and to regulate and control the same for the purpose of irrigation."

These powers seem little different than those contained in the articles of the East River Bottom Water Company. Yet in the Fower case it was held that the company had title to the water. Whether there were conveyances of water rights to the Provo Bench Canal and Irrigation Company does not appear. Nor does it appear in the record in this case that there were no conveyances. For aught we know water rights were conveyed to the East River Bottom Company. It should not be assumed such was not the case. In any event, I have much doubt as to whether it is a plausible theory that the company was only formed to manage and distribute the water and that a certificate of stock showed no participating rights in a corporation which owned water but was evidence only that the holder had the right to demand service from the company in the form of a water distribution. I feel quite confident that when stock was transferred from one party to another it was conceived of as transferring a right to obtain water from the corporation by virtue of water rights which it was thought the corporation owned. *George* v.

*Robison,* 23 Utah 79, 63 P. 819. I doubt whether any transfer of water rights was made separately from the stock. If not, it would seem that under the theory of Mr. Chief Justice MOFFAT there would have been no severance of the water from the land to which it was originally appurtenant and there are transferees of stock who have not obtained what they thought they had bargained for and obtained.

McDONOUGH, Justice (dissenting).

I concur in the dissenting opinion of Mr. Justice WOLFE.

PRATT, J., on leave of absence.