## UNION PAC. R. CO. v. BLAIR et al.   (J. S. CAMPBELL CO., Intervener).

No. 2715.   Decided February 11, 1916.   Application for Rehearing April 26, 1916.   (156 Pac. 948.)

1. CORPORATIONS — STOCKHOLDERS — SUBSCRIPTIONS — PAYMENT IN PROPERTY. In a suit by a creditor upon stock subscriptions, stockholders may be credited the value of property turned in upon their subscriptions, notwithstanding failure to comply with Comp. Laws 1907, Section 316, requiring a statement of such property and its value in the articles of incorporation.[1]  (Page 42.)

2. CORPORATIONS — STOCKHOLDERS — SUBSCRIPTIONS — PAYMENT IN PROPERTY. In a suit by a creditor upon stock subscriptions, allowing stockholders credit upon their subscriptions for the value of property turned in, does not conflict with Const., Art. 12, Sec. 5, forbidding issuance of corporation stock except to bona fide subscribers.  (Page 48.)

3. CORPORATIONS — STOCKHOLDERS — SUBSCRIPTIONS — PAYMENT IN PROPERTY. Evidence in a suit by a creditor on stockholders' subscriptions, *held* to show that subscriptions were entirely paid up in cash and property.  (Page 51.)

---

[1] *Richardson* v. *Treasure Hill M. Co.*, 23 Utah 366, 65 Pac. 74.

On Application for Rehearing.

4. CORPORATIONS — STOCKHOLDERS — SUBSCRIPTIONS — PAYMENT IN PROPERTY. Property turned in on stock subscriptions is to be credited at its market value at the time. (Page 56.)

FRICK, J., dissenting in part.

Appeal from District Court, Second District; *Hon. J. D. Call,* Judge.

Action by the Union Pacific Railroad Company against Preston A. Blair and others, in which the J. S. Campbell Company intervened.

Judgment for defendants. Plaintiff appeals.

AFFIRMED.

*P. L. Williams* and *Geo. H. Smith, H. B. Thompson, C. P. Hollingsworth,* for appellant.

*Joseph Chez* and *A. W. Agee,* for respondents.

FRICK, J.

The plaintiff, a corporation, commenced this action in equity against Preston A. Blair, Lars Hansen, J. P. Blair, Simon S. Jensen, Stephen S. Blair, and Seth M. Blair, as stockholders of the Blair-Hansen Live Stock Company, a corporation, and also against said corporation. The plaintiff, hereinafter called appellant, sued the individual defendants named above, whom we shall call respondents, to recover an alleged balance due upon their stock subscriptions as stockholders of said Blair-Hansen Live Stock Company, hereinafter called company. Appellant, in its complaint, in substance, alleged that said company was incorporated with a capital stock of $50,000 divided into 500 shares of one hundred dollars each; that Preston A. Blair, Simon S. Jensen, and Lars Hansen had each subscribed for fifty shares, and that Stephen S. and Seth M. Blair had each subscribed for ten shares of said capital stock; that the six subscriptions as aforesaid amounted to a total of 220 shares, or $22,000. It is further alleged that the first four subscribers above named

had only paid the sum of $2,500 each on their subscriptions, and that the last two had only paid $500 each on the amount they had subscribed. It was also alleged that the appellant had obtained a judgment against said company for the sum of $1,344.57, upon which, before the bringing of this action, execution had been duly issued and returned wholly unsatisfied, and that said company was insolvent. The appellant therefore prayed for judgment against said delinquent subscribers for the amount due by each upon his unpaid subscription, or so much thereof as would pay its claim, and for general relief. The individual defendants filed a joint answer in which they admitted that they had subscribed for stock in said company as stated; admitted that said company was insolvent, and in effect denied all other allegations in the complaint except they admitted the corporate capacity of said company. They also affirmatively pleaded full payment of their subscriptions. The company filed a separate answer in which the admissions and denials in effect were the same as those of the individual respondents.

On the 14th day of January, 1914, when the case was called for trial, the J. S. Campbell Company, a corporation, hereinafter called intervener, was permitted to file its complaint in intervention in the action in which complaint it set up a judgment which it alleged it had obtained by confession against said company on the 10th day of January, 1914, amounting to $1,252.35. The appellant filed a reply to the intervener's complaint, in which it alleged that said judgment was void and of no force or effect for reasons stated in the reply. We remark that it is not necessary to set forth the reasons alleged by appellant why it claimed the intervener's judgment void since that judgment, for the reasons hereinafter appearing, in no way affects appellant's rights in this proceeding.

The evidence adduced at the trial developed that while the articles of incorporation of the company purport to have been prepared and signed by the incorporators on the 20th day of January, 1909, yet they were not sworn to by three of the incorporators, as provided by Comp. Laws 1907, section 315, until the 12th day of June, 1909. On that day they were duly

filed with the County Clerk of Weber County, and on the 15th day of said month they were also filed with the Secretary of State, and he, on said date, duly issued a certificate of incorporation as provided by our statute. From the testimony of Mr. Jensen, who was the secretary and treasurer and bookkeeper of said company, at the times in question here, and whose testimony we shall accept as true for the purpose of this statement, it appears that the individuals above named who became the stockholders of said company had, since early in the year 1909, been engaged in the live stock businesss under the name adopted by said company; that they had contemplated forming a corporation, but, for reasons not material here, had deferred the completion of the organization thereof until the 12th day of June, as before stated; that on said date, as part payment of the capital stock of each subscriber, there was turned over to said company the following property, to wit:

| | |
|---|---:|
| 450 wethers, for which the incorporators had paid the sum of ...................................$ | 1,241.25 |
| Also 1,464 wethers, for which they had paid..... | 4,100.00 |
| Also 500 wethers, for which they had paid........ | 1,325.00 |
| Also 249 head of sheep, for which they had paid... | 1,025.75 |
| They had also advanced on a lot of sheep purchased by them, which were turned over to the company, the sum of......................... | 500.00 |
| Upon another lot the sum of.................... | 250.00 |
| Upon some bucks that they had purchased, the sum of ...................................... | 25.00 |
| They also claimed that they had paid freight upon the sheep aforesaid in the sum of............. | 420.80 |
| And for commissions paid the sum of............. | 112.40 |
| They also claimed that they had turned over horses to the company worth...................... | 500.00 |
| A camping outfit worth......................... | 175.00 |
| And one dog worth ............................ | 10.00 |
| Making the total amount of property turned over on said date the sum of........................$ | 9,685.20 |
| From which should be deducted an amount received for sheep sold during the period aforesaid, and which were not turned over to the company, amounting to............................ | 388.25 |

Leaving the net value of the property turned over
to the company on said date the sum of..........$ 9,296.95
In addition to the foregoing Mr. Jensen testified
    that the individual stockholders had paid in cash
    as follows:
Money deposited in the bank on the 9th day of June,
    1909, the sum of ............................     811.69
Cash on stock subscriptions paid by all, the sum of.   8,600.00
Other items, which we have deemed it proper to
    allow, the sum of...........................    1,900.00

Making a grand total paid in upon the stock sub-
    scriptions, the sum of......................$20,608.64

The capital stock subscribed for, as we have seen, amounted
to the sum of $22,000. There remained thus the difference
between the amount of the capital stock subscribed for, and
what was paid in, both in property and in money, which
amounted to $1,391.36.

The individual respondents, however, claimed, and the court
allowed them, credit for other items of expenses which were
incurred by them prior to June 12, 1909, which, in the judg-
ment of the court, when added to the payments we have
enumerated above, paid for the whole of the subscribed stock,
and hence the court found that the respondents had paid
their subscriptions in full and entered judgment in their
favor and against both the appellant and the intervener dis-
missing their complaints, and entered judgment for costs
against them.

The appellant alone appeals from the judgment. Among
other assignments appellant insists that the court erred in al-
lowing respondents any credit upon their subscriptions for
the sheep and other property turned over by them to
the company on June 12, 1909, as before stated. This
contention is based upon Comp. Laws 1907, section 316,
which, so far as material to the present contention, pro-
vides:

"Where subscriptions to the capital stock of any corpora-
tion formed under the provisions of this chapter shall con-
sist, in whole or in part, of property necessary to the pursuit
agreed upon, there must appear in the articles of incorpora-
tion a description of the property so taken, with a statement

of the fair cash value thereof, which statement, except in the case of corporations organized for mining or irrigation purposes, shall be supplemented by the affidavits of three persons, to the effect that they are acquainted with said property, and that it is reasonably worth the amount in cash for which it was accepted by the corporation; and the owners of such property shall be deemed to have subscribed such amount to the capital stock of such corporation as will represent the fair estimated cash value of so much of such property, or of such interest therein, as they may have conveyed to such corporation by deed actually executed and delivered.''

The articles of incorporation in question here did not contain the statement required by the foreging section, nor any statement concerning the taking of property; nor were the articles of incorporation supplemented by the affidavits required by said section, nor by any affidavits or statement whatever. Counsel for appellant, therefore, contended in the court below, and here contend, that under the foregoing statute no credit for property can be given upon a subscription as against the creditors of an insolvent corporation of the character of the corporation in question here unless the incorporators have complied with the provisions of the statute. It will be observed that the foregoing statute does not, at least in terms, declare payments in property void; nor does it prescribe any penalty for a failure to strictly comply with its terms. The question here presented has, however, in some form at least, been passed on by the courts many times. While the decisions are not in full accord, yet we think the great weight of authority is to the effect that payments in property, under a statute like ours, may be allowed by a court of equity as against creditors of an insolvent corporation to the extent of the actual value of the property, when the property received is of the kind or character in which the corporation deals or which it requires in its business, where the transaction between the stockholders and the corporation is entered into in good faith. The rule adopted by the courts is well stated in 10 Cyc. pp. 471, 472, 473, 475, thus:

"Where the charter or governing statute does not require payment

Union Pac. R. Co. v. Blair et al., 48 Utah 38.

in cash, then the shares may be paid for in such property as the corporation would have occasion to buy, at a fair valuation provided the transaction is in good faith. * * * Even where the charter, statute, or other governing instrument, by its terms, requires payment in money, yet unless the language is such as to import a prohibition of anything but money, the courts are generally agreed that payment may be made in any kind of property or services which the corporation may lawfully purchase in the prosecution of its business, provided it be done in good faith, and provided such property or services be conveyed or rendered at a fair valuation. The reason is that the law does not require the parties to go through the vain transaction which would be exhibited if the subscriber should pay for his shares in cash and if the corporation should hand back the cash in purchasing from the subscriber such property as the corporation might wish to buy from him; or, what would be the equivalent of such a transaction, that there should be a mere exchange of checks between the parties. * * * The 'true value rule' is that payment of corporate shares in anything except money will not be regarded as payment, except to the extent of the true or actual value of the property turned in and received in lieu of money, and regardless of the question of fraud. Stated differently, the 'true value rule' is that where payment is made in property, labor, services, or in anything other than money, the commodity must be turned in at its true value at the time, and that an over-valuation of it, or an undervaluation of the shares, leaves the shares unpaid to that extent, and the shareholders liable to make up the deficiency in favor of creditors of the corporation, without regard to the question whether the discrepancy was the result of fraud, mistake, bad judgment, or a cheerful optimism. Under this rule, in an action to charge a shareholder with the corporate debts up to the amount of his stock, because the stock has been issued for property not worth its par value, it is not necessary to prove that the trustees were guilty of fraudulent intent; but the true inquiry will be: What was the reasonable value, or the reasonable market value, of the property conveyed, or the services rendered? * * * On the theory that the 'true value rule' is a rule of public policy, the right of a creditor of the corporation to enforce the liability of its shareholders who have not paid their subscriptions in full is not dependent in any degree upon the fact of his knowledge at the time of extending the credit, that such subscriptions were or were not paid in full, although this is not the doctrine of all the courts."

We can see no good reason, nor do we discern any equity, in denying to those who, in good faith, have contributed property to a corporation in payment, or in part payment, of

their subscriptions the right to show just what the property
so contributed was actually worth in money at the time the
corporation was organized. What possible injury can result
by permitting such to be done? It is suggested, however,
that the subscribers being allowed to place their own value
upon the property which no longer may exist and at a time
remote from the time when it was actually turned over to the
corporation tends to foster injustice and to the inflation of
values of the property actually turned over. The question
is, however, also pertinent whether the arbitrary denial of
credit for what was actually turned over in good faith does
not also lead to injustice and wrong. If the courts will but do
their whole duty no great wrong or injustice can result from
allowing credit to the stockholders for the actual cash value
of the property turned over by them to the corporation even
under our statute. Courts, of course, must exercise the ut-
most care to prevent injustice by limiting the credits to be
given to the actual value of the property turned over. Each
case, in that regard, should be permitted to furnish a guide
of its own. In this case we have found no difficulty in allow-
ing for the property what was paid for it, and in view that
all of it was purchased and paid for only a short time before
it was turned over to the company we have deemed it but just
to fix the time of payment as of the date of actual incorpora-
tion. This, it seems to us, is equitable. No doubt if the stat-
ute forbade such a course the courts would be powerless;
but our statute, as we have seen, does not forbid us from
giving credit in accordance with the rules of equity we have
outlined. If the statute is followed a corporate creditor may
not attack property payments for subscriptions except for
fraud, although the corporation is insolvent. Under statutes
like ours where the statute is not followed and the corporation
is insolvent, such a creditor may, however, assail property
payments without claiming fraud by merely alleging that the
subscriptions were not paid in money and are not fully paid,
and when such is the fact the burden is cast upon the stock-
holder who has paid his subscription in property to show
that the property contributed by him was worth in cash the
amount for which he received credit upon his subscription.

If the property is thus shown to have been worth as much as the amount of the subscription it will be deemed as having been fully paid, but if the property was worth less than that amount the subscriber will be allowed credit only for the actual value of the property and will be required to pay the deficiency, if any, in money to the creditors of the insolvent corporation in case a proper action is commenced for that purpose. That an action in equity, like this one, is the proper remedy in cases of this kind is now well settled. 1 Cook on Corporations (6th Ed.) sections 199, 200, and 204. See, also, 4 Thompson on Corporations (2d Ed.) sections 3960, 3962, and 3975, upon the question that under a statute like ours credit will be given to the subscriber for the actual value of the property contributed by him in payment of his subscription, and upon the question of remedy, see same volume, section 4851. This court is also, in a measure at least, already committed to what is, by the text-writers, called the ''true value rule'' in paying for stock subscription, as appears from the opinion in the case of *Richardson* v. *Treasure Hill M. Co.,* 23 Utah, 366, 65 Pac. 74. True, the corporation involved in that case was a mining corporation and thus was expressly excepted from the operation of the provision of section 316, *supra,* but from what is said in the opinion relating to the general subject of paying for stock subscriptions it is clear that the court, as then constituted, felt constrained to follow the ''true value rule.''

It is contended by appellant, however, that, inasmuch as it was made to appear from the uncontradicted evidence that between the time the articles of incorporation were signed and the time they were filed, as required by our law, the respondents declared what is called a cash dividend of $2,000, which was divided among the individual respondents here in proportion to their subscriptions as before stated, they should be compelled to pay back said $2,000 to the extent at least that it is required to pay the debts of the corporation. Upon the other hand, it is contended by respondents that there were expenses paid by them during the ninety days preceding the filing of the articles of incorporation, and that the sheep that were purchased during said ninety days and were turned over

to the company were worth more on the 12th day of June, 1909, that the amounts paid therefor, which amounts we have hereinbefore fully set forth. They also claim other items of credit, which, however, are not deemed of importance. In that connection respondents contend that although they had not in any particular complied with the statute in either verifying the articles of incorporation or in filing them, nevertheless, the corporation was a corporation *de facto*. We cannot see how it can help respondents any whether it be held that there was a corporation *de facto* during the ninety days or not. We have given them full credit for every dollar that Mr. Jensen, the secretary and treasurer and bookkeeper, testified they paid for the sheep and property turned over, and in order to protect the creditors of the corporation we have fixed the date of payment as of the 12th day of June when the articles of incorporation were actually filed as required by law. That, in equity and good conscience, under the circumstances, is all they should ask at the hands of a court of equity. If, therefore, under the circumstances, the sheep were worth more than the money paid for them, the difference, if any, belonged to the corporation, and not to the respondents. If the respondents had paid their subscriptions in money and sheep at eighty or ninety per cent. of their value had been purchased, the profit would have belonged to the corporation, and not to them. Where, as here, the evidence is clear and undisputed with regard to what was actually paid for the property which is turned in as payment for subscriptions, and where the money was paid so short a time before the corporation was organized, the subscriber, in order to protect the creditors of the corporation, should be given credit only for the money he paid and nothing more. That is fair to him and also fair to the creditors of the corporation, and it comports with the spirit if not the strict letter of the statute. Besides, the increased value claimed by the respondents is entirely too uncertain and speculative to be allowed in a case like this. Where, as here, the incorporators in forming a corporation utterly fail or neglect to comply with plain statutory provisions which are intended to prevent the practice of fraud and injustice upon the creditors of a corporation,

and which were enacted for the protection of such credi-
tors, the stockholders may not complain if in a court of equity
they are compelled to show by positive proof just what was
the actual value of the property that was turned over to the
corporation in payment, or in part payment, of their capital
stock. Not to require at least that much is to invite violations
of the statute by all who contemplate the organization of cor-
porations. In a case of this kind the evidence respecting value
should be clear and convincing. Moreover, respondents were
amply compensated by the $2,000 which they received as divi-
dends during the ninety days preceding the filing of the
articles of incorporation for all additional expenses and other
items of credit claimed by them. That, we shall assume, rep-
resented the profits of the enterprise while it was in their
hands as individuals, and so regarding it they should not be
required to account as contended by appellant.

In view of the foregoing facts and the law applicable there-
to the district court was by far too liberal in allowing the
claims of respondents. Nor does the evidence, taken as a
whole, sustain the finding that the subscriptions were paid in
full. Indeed, there is no specific finding upon the question of
stock payments. All that the court found, or what is called a
finding, is a mere conclusion. The so-called finding reads as
follows:

"That the said defendants, and each of them, have paid
in full their respective said subscriptions to said capital stock
of the Blair-Hansen Live Stock Company; that there is
nothing due or remaining unpaid, whatever, on their said
stock subscriptions."

There is no finding how the stock was paid for, nor what,
if anything, was the value of the property which was turned
in as part payment of the subscriptions. There is not,
therefore, any finding whatever upon that issue. While, **2**
under the facts and circumstances of this case, we feel
constrained to allow respondents to retain said $2,000 for the
reason already stated and because we have allowed them
credit only from the date that the articles of incorporation
were completed and filed, yet, from the whole evidence, we are
also convinced that they should not be allowed any other

credits except such as we have allowed them.   We are also of
the opinion that in making the allowances aforesaid a rea-
sonable as well as a practical construction is placed upon our
statute.    Nor does such a construction in any way conflict
with article 12, section 5, of our Constitution, which is also
relied on by appellant.   That section, so far as material here,
reads as follows:

"Corporations shall not issue stock, except to bona fide
subscribers thereof or their assignee, nor shall any corpora-
tion issue any bond, or other obligation, for the payment of
money, except for money or property received, or labor
done."

We can find nothing in the foregoing language which pro-
hibits corporations from issuing stock for either property or
labor, or for both.   As we read the foregoing provision it is
in strict harmony with our statute as we have construed it.

Appellant, however, further contends that the court erred
in permitting the intervener to introduce in evidence the
judgment obtained by it by confession as before stated.   If
that judgment were material here it would be very doubtful
indeed whether it was properly received in evidence, not upon
the ground urged by appellant, however, that it merely repre-
sented assigned claims of stockholders of the corporation,
since that objection is not good in this jurisdiction.   This
court is committed to the doctrine that a stockholder as a
creditor may maintain an action in equity to recover unpaid
subscriptions of stock, but in doing so he must, if delinquent,
first pay in the unpaid portion of his subscription and then
after having done so he may share ratably with other credit-
ors in the fund derived from unpaid subscriptions.   *Wilson*
v. *Kiesel*, 9 Utah, 406, 35 Pac. 488.   To the same effect are
*Bissit* v. *Kentucky, etc., Co.* (C. C.) 15 Fed. 353, and note;
*Thompson* v. *Lake*, 19 Nev. 103, 7 Pac. 68, 3 Am. St. Rep. 797;
*Thompson* v. *Crockett*, 19 Nev. 242, 9 Pac. 121, 3 Am. St. Rep.
883.   In Cook on Corporations (6th Ed.), Section 205, the rule
is tersely stated thus:

"A stockholder who is also a creditor may file a bill as a
creditor to reach unpaid subscriptions.   He must, however,
pay his own subscription."

Appellant, therefore, cannot rely upon the objection that a subscriber may not sue or participate in a creditors' action to reach unpaid subscriptions. The court did not err, therefore, in admitting the judgment in evidence upon that ground, and, in view that the judgment cannot affect appellant's rights for the reason now to be stated, we need not now pause to point out why the confession of judgment was so grossly irregular as to practically destroy its effect. As we have pointed out before, the court rendered judgment against the intervener's claim as well as against the claim of appellant and dismissed the action as to both. The intervener has not appealed from that part of the judgment affecting it, while the appellant has appealed from the judgment so far as it was affected thereby. The judgment against the intervener must therefore stand for the simple reason that we are powerless to review it. *Rolapp* v. *Railroad Co.*, 37 Utah, 561, 110 Pac. 364. Whatever error, if any, the court may have committed, therefore, in admitting the judgment in evidence is harmless so far as appellant is concerned. What we do hold, therefore, is that in view that the intervener has not appealed from the judgment against it, it cannot now participate in any judgment that the appellant may recover against the respondents upon their unpaid subscriptions.

The only question, therefore, that remains to be solved is: What, in view of the evidence, should the findings and judgment be? The respondents Preston A. and J. P. Blair, Lars Hansen, and Simon S. Jensen each subscribed for fifty shares or for $5,000 of the capital stock of the company. Each one of those; therefore, subscribed for 5/22 of the amount of the capital stock subscribed. The respondents Stephen S. and Seth M. Blair each subscribed for 1/22 of the whole stock subscribed. Each one of the four first-named respondents should therefore be required to pay 5/22 of the unpaid subscriptions, or 20/22 in all, and the last two should each be required to pay 1/22 thereof, or 2/22 in all. Now, as we have seen, the unpaid subscriptions amount to the sum of $1,391.36, of which sum each one of the first four subscribers should contribute the sum of $316.218, or the four should contribute the sum of $1,264.87; while the last two named should each con-

tribute the sum of $63.2436, or the combined sum of $126.48. When, therefore, the sum of $1,264.87 which the first four should contribute is added to the sum of $126.48 which the last two should pay, it, gives us $1,391.359, which is the amount of the unpaid subscriptions. Each one of the subscribers should be required to pay 8 per cent. interest upon the amount unpaid by him as shown above from the 10th day of May, 1913, which was the date upon which the action was commenced and therefore constituted a demand, if the interest is necessary to pay appellant's demand and costs, and, if not, then only so much as shall be required for that purpose.

The judgment of the District Court of Weber County is therefore affirmed so far as it relates to the intervener, and should be reversed and the cause remanded to that court, with directions to modify its findings of fact and conclusions of law so far as they relate to the appellant's claim, and to substitue others and make them conform to the facts as herein stated, and to enter judgment in favor of appellant and against the individual respondents in amounts hereinbefore stated, and in accordance with the views herein expressed.

Since writing the foregoing my Associates, for reasons satisfactory to themselves, have arrived at the conclusion that the judgment should be affirmed *in toto*. While, in view of the whole record, as I read it, and the law applicable thereto, I am unable to yield my judgment to theirs, yet, in view that they constitute the court in this case, their judgment, and not mine, must prevail. The judgment appealed from is therefore affirmed, with costs to respondents.

McCARTY, J.

The articles of incorporation were signed January 20, 1909, were filed with the County Clerk of Weber County June 12th, and with the Secretary of State June 15, 1909. The corporation, therefore did not come into existence until the last-mentioned date. Comp. Laws of 1907, Section 319; Machen's Law of Corporations, Section 137. The undisputed evidence shows that before the corporation was perfected the promoters (defendants herein) made payments

on their subscriptions to the capital stock aggregating $11,100 as follows: Preston A. Blair, $2,000; Stephen S. Blair, $800; Seth 'M. Blair, $800; J. P. Blair, $2,500; Simon Spencer, $2,500; Lars Hansen, $2,500. From the time the articles were signed (January 20, 1909) until the corporation came into existence (June 15, 1909) the above-mentioned defendants did business in the name of Blair-Hansen Live Stock Company—the name designated in the articles of incorporation. During this period of time the company was liable as a partnership, but not as a corporation, for the business transacted by it and in its name. 10 Cyc. 676; Cook on Corp. Sections 233, 424. Fraud is not charged in the complaint and hence is not an issue in the case. Plaintiff bases its right to recover solely on the ground that the subscriptions for the capital stock have not been paid in full. The record shows that the transaction out of which plaintiff's claim arose took place long after the corporation came into existence. The business, therefore, transacted by the company before the corporation was created can have no possible legal bearing on the case. The only questions presented by this appeal are: (1) Have the subscribers to stock (defendants herein) paid in full for the stock subscribed for by them? and (2) did the cash and the cash value of the property transferred by the company to the corporation at the time the corporation came into existence equal the aggregate of the payments theretofore made on the stock subscribed? The evidence, without conflict, shows that the assets of the company to which the corporation succeeded when it came into existence consisted, among other things, of the following property: 2,665 sheep, of the value of $9,327.50; cash in bank, $811.69; two horses, of the value of one hundred dollars; team and camp outfit, $375; one dog, ten dollars; and $775 advanced on the purchase of sheep that were later delivered to the corporation—aggregating $11.399.19, or $299.19 more than had been paid on stock subscriptions. The corporation not only succeeded to the different items of property mentioned, equal in value to the cash paid on stock subscriptions, but it got the benefit of $299.19 earnings—profit—of the company while it was a partnership concern. Therefore plaintiff and other parties

who subsequently did business with the company as a corporation were benefited rather than injured or prejudiced by the corporation accepting the assets of the partnership in lieu of the cash paid on stock subscriptions. Therefore plaintiff and the parties who subsequently did business with the company could not possibly have been prejudiced because the corporation accepted property in lieu of the cash paid on the stock subscriptions. The corporation not only succeeded to property equal in value to the cash paid in the stock subscriptions, but, as stated, got the benefit of $299.19 earnings —profit—of the company while doing business as a partnership. The books of the company were introduced in evidence by plaintiff, and they show that the balance due on the subscriptions for capital stock at the time the corporation was created (June 15, 1909) was later paid in full. S. S. Jensen, the secretary of the company—one of the defendants herein— testified at considerable length and explained in detail when and under what circumstances the payments were made. I have examined the record with much care and fail to find any evidence in conflict with his testimony upon that point. I am also of the opinion that the finding made by the court ''that the said defendants and each of them have paid in full their respective subscriptions to said capital stock,'' etc., is sufficient and is amply supported by evidence.

For the reasons stated I am of the opinion that the judgment of the trial court should be affirmed, with costs to the respondents.

STRAUP, C. J.

I concur with Mr. Justice FRICK on the points and in his conclusions affirming the judgment in part. I dissent from his conclusions reversing the judgment in part. In that I concur with Mr. Justice McCARTY. While the evidence as to the paid-up subscriptions may be in conflict, yet I think there is good and sufficient evidence to support the findings in such respect. I therefore think that the judgment of the court below should be affirmed in all its parts.

Union Pac. R. Co. v. Blair et al., 48 Utah 38.

On Application for Rehearing.

McCARTY, J.

Counsel for appellant have filed a petition for rehearing. No question or point is presented by the petition that was not elaborately discussed in the original briefs filed in the cause and fully argued by counsel in their oral presentation to this court of the questions involved.

Our attention, however, is called to a miscalculation of figures (which we have corrected) that in no way affects the result arrived at in the prevailing opinion. Notwithstanding every point presented by the petition was carefully considered in the opinions heretofore filed in the cause we nevertheless shall, in view of the earnestness of counsel in their insistence that we have both misconceived the facts and misapplied the law to the facts, again partially review the case and again consider the questions presented by the petition.

We say in the prevailing opinions that the property to which the company succeeded at the time it was incorporated exceeded $11,000 in value. It is contended that this is error. Counsel assert that the subscribers to stock—the members of the company before it was incorporated—should be allowed the amount only for the property that it cost them; that is, the market value of the property at the time it was purchased by them should be the price at which it should have been listed to the corporation. It will readily be observed that the difference between the opinion of counsel and the judgment of the court on this point is due to the fact that the court based its judgment on the market value of the property, as shown by the undisputed evidence, at the time it was turned over to and accepted by the corporation, and counsel base their opinion as to value on the price paid for the property by the members of the company some three months before the company was incorporated. Counsel in their brief filed in support of the petition for a rehearing say:

"This court should * * * be very loth to accept the oral testimony of the delinquent subscribers given on the trial of this case some five years after the transaction in question took

place, and to allow them credit for any amount in excess of
the amount shown by the books to have been paid by them
for the property on hand at the time of the incorporation.
*   *   *   The question of value was alone testified to by the
interested subscribers and not by   *   *   *   disinterested per-
sons who knew the character of the property taken over by the
corporation, together with its value.''

And again:

''We propose to show by Mr. Jensen's testimony and the
books of account he kept for the company that the stock sub-
scriptions have not been paid in full.''

The books of account to which counsel refer, and the cor-
rectness of which they vouch for, were introduced in evidence
by appellant, and they, in connection with the evidence of
Mr. Jensen, secretary of the company, show that the price of
sheep during the time the company did business before it was
incorporated fluctuated.   On February 3, 1909, the company
purchased 2,392 head of sheep for $10,760, and a month later
(March 5, 1909) sold 2,365 of these sheep for $14,190, which
netted the company (the subscribers for stock) a profit of
$2,554.94.   The testimony of Mr. Jensen and the books also
show that the sheep the company had on hand and turned
over to the corporation June 12, 1909, were purchased by the
subscribers about four months prior to the incorporation, at
about $2.75 per head.   The testimony of Jensen and the books
also show that on June 9, 1909, a few days—within a week—
prior to the incorporation of the company twenty-five head of
these sheep were sold for $89.10, which was approximately
$3.56 per head.   Three witnesses testified, and their evidence
is not disputed, that the market value of the entire herd on
June 12, 1909, was $3.50 per head.   In fact there is absolutely
no conflict whatever in the evidence on this point.

Where subscribers to stock of a corporation turn in prop-
erty in lieu of cash on their stock subscriptions, as was done
in the case at bar, the parties are entitled to credit in a sum
equal to the market value of the property at the time it is
turned over to and accepted by the corporation, unless the
parties agree to accept credit for a less amount.   The con-
tention that the subscribers to stock in the case at bar should

be given credit for the amount only that they paid for the property which they turned over to the corporation **4** June 12, 1909, finds no support in law, equity, or reason, and is opposed to every known sound business rule governing transactions of this kind. To show the unreasonableness of counsel's position we have only to reverse the proposition for which they contend. Suppose, for illustration, the sheep had cost these parties $3.50 per head (instead of about $2.75 as shown by the evidence), and their market value at the time they were turned over to the corporation (June 12, 1909) had been $2.75 per head, would counsel be here contending that the subscribers should be given credit for seventy-five cents per head on each sheep in excess of the market value? Of course they would not. It would be an undeserved reflection on their learning and ability as lawyers to even suggest that they might do so.

Regarding the unpaid subscriptions at the time the company was incorporated, June 12, 1909, counsel say:.

"We submit that the second half, which would be $11,000, of the stock subscriptions was not paid in full. The books of the company conclusively establish that after incorporation the following payments were made: Preston A. Blair, $2,000; Lars Hansen, $2,000; Simon S. Jensen, $2,000; Stephen S. Blair, 300; Seth M. Blair, $300; J. P. Blair, $2,000—a total of $8,600. To this should be added $1,900 covering property thereafter delivered to the company by J. Park Blair and Lars Hansen and applied upon their stock subscriptions, making $10,500. We have endeavored above to show that there remains due on the second half of the stock subscription $500."

Mr. Jensen's testimony, and the books of account he kept for the company, show, that Preston A. Blair subscribed for 50 shares of the capital stock of the corporation, for which he agreed to pay $5,000; that before the incorporation he paid $2,500, leaving a balance of $2,500 due on his stock subscription; that on March 31, 1910, he paid $2,000, and on July 30, 1910, he paid the balance, $500, on his subscription. It will be noticed that counsel for appellant have inadvertently omitted to include the $500 last mentioned in their foregoing

statement of the payments made on stock subscriptions. If counsel had included the $500 payment in their statement of the payments made on the stock subscriptions, the $11,000 due thereon at the time the company was incorporated would be accounted for, and according to their own table of figures there would be nothing due the corporation on the stock subscriptions. In the former prevailing opinion the writer stated, and he again asserts, that the evidence without conflict shows the subscriptions of stock were fully paid, and that the trial court did not err in so finding.

STRAUP, J., concurs.

FRICK, J.

I concur with Mr. Justice McCARTY in his statement that counsel have presented nothing new in their petition for a rehearing, and that for that reason it should be denied. In view, however, that silence on my part might be taken as some evidence that I have receded from the position taken in my former opinion I desire to state that I am still firmly convinced that I allowed respondents everything they were entitled to under their own record evidence, and that both my Associates and the trial court have established a rule for allowing credits for subscriptions to stockholders in cases where no attempt is made to comply with the statute which they will find difficult to follow in the future. In this case by permitting the individual stockholders to retain all the profits realized prior to June, 1909, upon the business, and by also allowing them the amounts stated in the prevailing opinions, they are in a much better plight than they would have been had they paid up their subscriptions in cash while the creditors of the corporaton must suffer all the losses.